2020 IL App (1st) 181834-U

THIRD DIVISION
May 13, 2020

No. 1-18-1834

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| JACK SHAW and SHAW REAL ESTATE GROUP, INC., | ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Plaintiffs-Appellants/Cross-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 16 CH 15693 |
| ILLINOIS DEPARTMENT OF FINANCIAL AND | ) | |
| PROFESSIONAL REGULATION, | ) | Honorable |
| | ) | Celia Gamrath |
| Defendant-Appellee/Cross-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    Held:    Where respondents failed to appear for an evidentiary hearing regarding violations of the Real Estate License Act, the Department of Financial and Professional Regulation did not violate their due process rights by proceeding with the hearing and imposing discipline in their absence. Additionally, the discipline imposed by the Department—including suspension of respondents' real estate licenses and fines—was not an abuse of discretion, and the circuit court improperly reduced the fines on administrative review.

¶ 2    Plaintiff-Appellants/Cross-Appellees, Jack Shaw and Shaw Real Estate Group, Inc.,

(SREG) (collectively, Shaw respondents) were sanctioned by the Illinois Department of Financial

and Professional Regulation (Department) for violations of the Real Estate License Act of 2000

(Act), 225 ILCS 454/1-1 et seq. (West 2018). Shaw respondents failed to appear at their scheduled hearing, and the Administrative Law Judge (ALJ) conducted a hearing in their absence. After the hearing, the Department Director suspended Jack's real estate broker license and SREG's broker corporation license each for a minimum of three years, and imposed separate $18,000 fines against each of them. The Director also denied Jack's application for a real estate managing broker license, pursuant to section 20-20(a) of the Act. The circuit court, on administrative review, reduced the fines to $5000 for Jack, and $13,020 for SREG, and otherwise affirmed the Director's decision.

¶ 3    In this appeal, Shaw respondents raise due process challenges to the Department procedure, and contend that the discipline imposed is "overly harsh" and "not supported by clear and convincing evidence." The Department, through the Attorney General, cross-appeals, alleging that the circuit court improperly reduced the fines assessed by the Department.

¶ 4    The record shows that in July 2013, the Department filed an administrative complaint against SREG, a licensed real estate broker corporation; Anne Shaw, a licensed real estate managing broker at SREG; and Robert Sher, a licensed real estate leasing agent at SREG.[1] The complaint alleged various violations of the Act regarding their operation of a rental finding service. On December 10, 2013, the Department filed a first amended complaint, adding Jack Shaw as an additional respondent, and on September 28, 2015, the Department filed the second amended complaint that is at issue in this appeal.

¶ 5    The second amended complaint alleged that respondents entered into rental finding services contracts with clients in exchange for payments. These contracts failed to contain information required by Department regulations, including a detailed statement of the services to be performed, a notification that funds would be refunded if the contract became null and void,

---

[1] The record shows that Jack is Anne's father, and Sher is Anne's brother-in-law.

and descriptions of the rental units. After entering into these contracts, clients were not shown properties that met their placement criteria, were not shown properties within the time agreed, were shown properties in poor condition, or were otherwise not found apartments by SREG. After SREG failed to find apartments for their clients, SREG denied the clients requests for refunds. The complaint further alleged that Jack and Sher wrongly held themselves out as managing brokers of SREG—which was a licensing status greater than the one they actually possessed—and that respondents failed to provide documents in response to requests by the Department.

¶ 6 The complaint alleged that such conduct was grounds for discipline against Jack's real estate broker license and SREG's real estate broker corporation license, for fines against them, and for denial of Jack's pending application for a real estate managing broker license. Specifically, the complaint alleged that the respondents' conduct violated the Act on the following eight grounds:

> § 20-20. Grounds for discipline.
>
> (a) The Department may refuse to issue *** a license, may *** suspend *** any license *** or take any other disciplinary or non-disciplinary action as the Department may deem proper and impose a fine not to exceed $25,000 upon any licensee or applicant under this Act *** for any one or any combination of the following causes:
>
> ***
>
> (10) Making any substantial misrepresentation or untruthful advertising.
> ***
> (12) Pursuing a continued and flagrant course of misrepresentation or the making of false promises through licensees, employees, agents, advertising, or otherwise.
> ***
> (16) Failure to account for or to remit any moneys or documents coming into his or her possession that belong to others.
> ***
> (18) Failure to make available to the Department all escrow records and related documents maintained in connection with the practice of real estate within 24 hours of a request for those documents by Department personnel.
> ***

> (21) Engaging in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public *** .
>
> ***
>
> (25) Any other conduct, whether of the same or a different character from that specified in this Section, that constitutes dishonest dealing.
>
> ***
>
> (27) Failing to provide information requested by the Department, or otherwise respond to that request, within 30 days of the request.
>
> ***
>
> (40) Disregarding or violating any provision of this Act or the published rules adopted by the Department to enforce this Act or aiding or abetting any individual, foreign or domestic partnership, registered limited liability partnership, limited liability company, corporation, or other business entity in disregarding any provision of this Act or the published rules adopted by the Department to enforce this Act.

225 ILCS 454/20-20(a)(10), (12), (16), (18), (21), (25), (27), (40) (West 2012).

¶ 7 Regarding administrative regulations violated, the complaint also cited 68 Ill. Admin. Code § 1450.785, which sets forth obligations owed to clients by operators of "rental finding services," defined as "any business that finds, attempts to find or offers to find, for any person who pays or is obligated to pay a fee ***, a unit of rental real estate or a lessee to occupy a unit of rental real estate not owned or leased by the business." 68 Ill. Admin. Code § 1450.785(a)(1) (West 2012). Finally, the complaint alleged that respondents had engaged in unprofessional conduct as set forth in the regulations, defined as "Failure to act in the best interests of the client." 68 Ill. Admin. Code § 1450.900(a) (West 2012).

¶ 8 While the Department filed its complaint and two amended complaints, the respondents filed motions to dismiss the original complaint and the first amended complaint, disputing the merits of the complaint and the application of the Act.

¶ 9 On May 8, 2014, an administrative law judge denied respondents' motion to dismiss the first amended complaint, finding that the respondents' arguments that the "facts as alleged by the Department are either not true or are misinterpreted, and, therefore, [they] are not in violation of

4

the *** Act" was a "determination to be made after all of the evidence is heard at a formal evidentiary hearing and not upon pleadings in a motion to dismiss." Respondents were ordered to file an answer to the complaint.

¶ 10    In their answer, respondents denied that they operated a "rental finding service." The respondents also denied the facts of certain violations of the Act, and asserted that other requirements of the Act did not apply to them due to their "unique business model."

¶ 11    During the course of the administrative proceedings, respondents were represented by three attorneys or sets of attorneys: Shaw Legal Services, Robert Orman, and Myron Mackoff.

¶ 12    Shaw Legal Services was the first to appear on behalf of respondents, filing a motion for a continuance of the preliminary hearing on August 14, 2013, a motion for a prehearing conference on September 10, 2013, and a motion to dismiss the complaint on October 2, 2013. Shaw Legal Services also filed an answer to the first amended complaint in May 2014.

¶ 13    On July 15, 2014, Shaw Legal Services appeared for a status hearing, and the case was scheduled for a formal hearing on November 12, 2014. Thereafter, the Department tendered discovery to respondents on August 26, 2014.

¶ 14    On September 29, 2014, Orman filed an "additional appearance" on behalf of respondents, and the November formal hearing date was stricken at his request. After additional continuances and an order requiring the respondents to tender discovery, Orman moved to withdraw as respondents' counsel on March 9, 2015, stating that he was "no longer able to represent Respondents" but that respondents would "suffer no prejudice" because "[t]he Shaw Law Offices and its attorneys [were] presently co-counsel in this matter." Orman was granted leave to withdraw on March 10, 2014, and the order was served on Shaw Legal Services.

¶ 15    On March 23, 2015, after the Department filed a motion for discovery sanctions against respondents, Mackoff filed a motion for leave to appear for respondents and an appearance on their behalf. He stated that he was "chosen by Respondents to take over from Mr. Ormon [*sic*] and continue the defense of this case." Mackoff entered a "substitute appearance." The case was continued multiple times, and the Department filed the second amended complaint on September 28, 2015. Mackoff filed an answer to the second amended complaint on behalf of respondents in November 2015, and the matter was set for formal hearing on March 30 and 31, 2016.

¶ 16    On March 21, 2016, Mackoff moved to withdraw as counsel for Jack, Sher, and SREG, but not Anne. Mackoff stated that Jack, Sher, and SREG "no longer want[ed]" him to represent them. The next day, the Chief ALJ granted Mackoff's motion, noting that Shaw Legal Services had not withdrawn from the case. The Chief ALJ further ordered that the formal hearing remained scheduled for March 30 and 31, 2016, and that Jack, SREG, and Sher "must appear" for the formal hearing. The order was served on Shaw Legal Services and Mackoff, as well as Jack, SREG, and Sher.

¶ 17    After withdrawing as counsel for the other respondents, Mackoff continued to represent Anne, and entered into a consent order between Anne and the Department. In the consent order, Anne stipulated that as the managing broker at SREG, she failed to adequately supervise the activities of SREG and its employees in violation of 68 Ill. Admin. Code §§ 1450.700 and 1450.705 (West 2012). Anne further agreed that the violations were grounds for discipline pursuant to 225 ILCS 454/20-20(a)(40) (West 2012). Anne agreed to accept a reprimand and to complete a 12-hour management broker continuing education course. She also agreed to cooperate with the Department, and testify if called, regarding the real estate activities of Jack, SREG, and Sher.

¶ 18    At the beginning of the administrative hearing on March 30, 2016, the ALJ noted that Sher was present, but neither Jack, nor any representative from Shaw Legal Services—the counsel of record for all respondents—was present. The ALJ also acknowledged that Anne was not present because she had previously entered into a consent order with the Department.

¶ 19    The respondents' former attorneys, Mackoff and Orman, were present. Mackoff reiterated that he had withdrawn as counsel, and stated that he was at the hearing only to hand over his file of discovery documents. Mackoff left the hearing after giving the file to Sher. Orman stated that he had previously withdrawn as counsel for all respondents, and that Jack had subsequently approached him to represent him alone. Orman stated that he belatedly remembered that he had previously represented all respondents, so he believed he could not represent Jack alone unless Sher waived the conflict of interest. Orman also stated that he was not prepared to try the case that day. The ALJ suggested that Orman contact Sher's counsel, Shaw Legal Services, to resolve the conflict issue, but Orman said that he did not "know what [a] good contact number would be." Orman asked to be excused, and the ALJ excused him.

¶ 20    After calling the case, the ALJ again noted that Shaw Legal Services was Sher's counsel of record. The ALJ asked Sher if the firm was going to appear at the hearing on his behalf, and he answered, "No, [it is] not." The ALJ asked if he had been in contact with his attorneys of record, and Sher replied that there "was some [e]-mail correspondence with a reminder that there's a case today for them." The ALJ asked the Department's counsel if he had heard anything about whether Jack would appear for the hearing. The Department's counsel said that "[t]here was an attorney who *** presented himself and said [Jack] would not be here, or was not here currently." The Department's counsel also stated that counsel had asked Sher, but Sher did not have any information about Jack appearing at the hearing. The ALJ noted that the "Rules of Administrative

7

Procedure, with regard to respondent's failure to appeal for a formal hearing, will apply in this case"—specifically, 68 Ill. Admin. Code § 1110.100 (West 2016), which states that "[f]ailure to appear at the time and place set for hearing shall be deemed a waiver of the right to present evidence."

¶ 21    Sher represented himself at the hearing. The ALJ explained the hearing process to him. Sher said that he was ready to proceed without counsel, and declined the ALJ's invitation to make one more attempt to reach his counsel. Later in the hearing, after a break in testimony, Sher told the ALJ that he had contacted Shaw Legal Services by text message, and counsel indicated that it would not represent him. The ALJ said that Shaw Legal Services "should have withdrawn from the case then."

¶ 22    During the two-day hearing, the Department presented four witnesses: two former clients of SREG, Monica Esono-Sanchez, and Monique Benjamin; and two Department investigators, Robert Wasiak, and Therese Burton. The Department also submitted exhibits consisting of application packets of SREG clients, as well as e-mail correspondence between Benjamin and SREG. At least one of the application packets contained Jack's signature.

¶ 23    Esono-Sanchez testified that in November 2012, she was living in a homeless shelter with her two young children, and contacted SREG after seeing an ad posted on the Craigslist website. Esono-Sanchez told SREG that she was seeking an apartment on the north side of Chicago near the Chicago Transit Authority's Purple and Red lines, and that she wanted an apartment in this location so that her children could commute to school. SREG charged her an upfront fee of $750, and later sought additional fees. Esono-Sanchez ultimately paid SREG a total of $1300.

¶ 24    SREG attempted to place Esono-Sanchez in an apartment on the south side of Chicago, in the Englewood neighborhood. After she refused this apartment, SREG did not find her another apartment, and Sher insulted her over her refusal of the Englewood apartment.

¶ 25    Benjamin testified that in February 2015, she was living in a basement with her two young children, which was hazardous to her asthmatic daughter's health. She needed to move by the end of April 2015, and was seeking an apartment in Rogers Park, Skokie or Evanston. She chose SREG because she had a past eviction and her husband had a criminal background. On the application packet, she did not list any evictions, but she told Sher verbally about her eviction. SREG sent her an e-mail stating that it had done a background check, was aware of her husband's criminal record, and that it was "okay." Based on the past eviction, SREG began to seek cosigners, and urged Benjamin to seek an apartment "out south." Benjamin told SREG that the location was inconvenient, and that it was not an area where she "would raise [her] children."

¶ 26    Benjamin paid a $180 service fee to SREG and $950 for her first month's rent. SREG asked Benjamin to help it by locating properties for rent. Benjamin, while pregnant, drove around after work with her children in the car to look for rental signs with phone numbers to contact. After emailing SREG the phone numbers, she would call SREG to discuss them. Benjamin estimated that she sent SREG over 50 numbers, and she questioned whether anyone from SREG ever called the phone numbers. Around April 15, 2015, Benjamin went to the SREG office in person because no one had responded to her e-mails in a week or more, and she needed to move quickly. She spoke with Jack, who said he was the owner of SREG. Jack told her that he was not aware of her emails and refused her request for a refund. Jack promised to find her an apartment within a week, but did not. Ultimately, Benjamin obtained an apartment in June 2015 through Hunter Properties. Benjamin stated that she never received a refund from SREG.

¶ 27    Department Investigator Wasiak testified that he investigated complaints received from clients of SREG, including Esono-Sanchez, Benjamin, Genevieve Bael, Karina Fausto, and Janice Jackson.

¶ 28    Wasiak testified that Esono-Sanchez sought an apartment in Rogers Park near her children's school, however, she was instead shown a single property on the South Side that she considered unsafe. An unlicensed employee from SREG showed her the apartment.

¶ 29    Benjamin told Wasiak that SREG instructed her to drive by herself to locate properties, and to report to Sher if she found a suitable apartment. Benjamin also told Wasiak that when she later requested a refund of her deposit, she was offered a partial repayment in an unspecified amount.

¶ 30    Regarding Bael, Fausto, Jackson, and Benjamin, Wasiak's investigation disclosed that each was required to pay both an application fee and first month's rent as a deposit in total respective amounts of $1080, $1200, $880, and $1130. Jackson told Wasiak that she dealt with a man named Shaw. SREG did not secure an apartment for any of these clients, and it did not refund their first month's rent payments.

¶ 31    During Wasiak's investigation, counsel for respondents told Wasiak that some client interactions with Jack or Sher had been video recorded. Wasiak requested the recordings but he did not receive them.

¶ 32    Wasiak concluded that, despite Anne being the managing broker at SREG, Jack and Sher were both holding themselves out as having statuses greater than their licenses, and were operating the brokerage in supervisory roles. Particularly, in one interview with a television news reporter, Jack said that he was the manager of SREG.

¶ 33    Department investigator Burton testified that she investigated a complaint filed by LaToya Irwin and Kenneth Perry (the "Perrys") in 2012. The Perrys reported that they gave SREG $120 as a credit check fee, along with a $1200 deposit. SREG told the Perrys that their credit would not be an issue in finding an apartment. The Perrys did not find an apartment through SREG, and were not refunded their deposit. They were shown a single unit, which was not painted, had missing cabinets, and lacked sturdy locks. When the Perrys rejected the apartment and sought a refund, Irwin spoke with Sher. Sher told Irwin that SREG had to show her only one apartment, and that she was not getting her money back.

¶ 34    During the course of her investigation, Jack told Burton that Anne put him in charge of the office when she was not there. Burton asked Jack for documents regarding the Perrys, and also requested escrow records from SREG. Neither Jack nor SREG produced the requested documents and records, and Jack told Burton that she would need a consent form to obtain the documents regarding the Perrys. Jack also told Burton that she did not have the right to visit the SREG office unannounced.

¶ 35    The Department entered into evidence the client agreements for the clients at issue, and rested. Sher chose not to testify and presented no evidence.

¶ 36    The ALJ subsequently issued his report and recommendation, including the following findings of fact. Jack and Sher operated SREG, which advertised on the Craigslist website its ability to find apartments for people who had barriers to tenancy, such as bad credit, criminal backgrounds, or past evictions.  Jack was an owner of SREG, he was a licensed real estate broker there, he exercised the authority to sign SREG contracts and to refuse to issue refunds to clients, and he was in charge when Anne, the licensed managing broker, was not available. Sher was also in charge when Anne was not available, and actively participated in most of the client matters at

11

issue. Sher signed most of the contracts at issue, refused refunds, and answered Department investigators' questions on behalf of SREG.

¶ 37     The ALJ concluded that SREG was a "rental finding service" under the administrative regulations, and any person who operates a rental finding service is required to comply with the regulations. 68 Ill. Admin. Code § 1450.785(a)(1), (2) (West 2012). Under the regulations, operators of rental finding services are required to furnish extensive information to clients, including the following:

> "b) Contract *** .
>
> > ***
> >
> > 7) A statement that information furnished concerning possible rental units may be up to two days old; and
> >
> > 8) A statement requiring the refund of all fees paid in connection with the contract if the contract is null and void for any reason *** .
>
> c) Disclosure *** .
>
> > 1) The name, address and the telephone number of the owner of each rental unit or the owner's authorized agent;
> >
> > 2) A description of the rental unit;
> >
> > ***
> > 5) A statement describing utilities that are located in the rental unit and included in the rent;
> >
> > 6) The occupancy date and the term of lease; [and]
> >
> > 7) A statement setting forth the source of the rental information (i.e., owner, owner's authorized agent)."

68 ll. Admin. Code § 1450.785 (West 2012).

¶ 38     The ALJ found that Shaw respondents and Sher failed to provide clients virtually any of the above information. He determined that this conduct hid the clients' legal protections from them, and that such conduct was of a character likely to deceive, defraud, or harm the public. The

ALJ further found that SREG found no rental unit for four clients, and only a damaged and unsecure apartment was shown to another. Despite failing to locate rental units for these clients, the clients did not receive refunds of the service fees and rental deposits. The ALJ determined that the failure to provide refunds, for which the respondents were responsible, constituted unprofessional conduct (68 Ill. Admin. Code § 1450.900 (West 2012)), and conduct not in the best interests of the client (225 ILCS 454/15-15(a)(2)(F) (West 2012)), in violation of the Act.

¶ 39   Regarding Esono-Sanchez, the ALJ determined that SREG failed to find her a rental unit in her preferred location as promised, and had employed an unlicensed assistant who showed a property to her. The ALJ explained that this violated 68 Ill. Admin. Code § 1450.740(c), (d), and (e) (West 2012), and that it was also against the best interests of the client, unprofessional conduct, and dishonest dealing in violation of 68 Ill. Admin. Code § 1450.900(a) (West 2012). After failing to find an apartment in Esono-Sanchez's preferred location, Sher, acting on behalf of Shaw respondents, "demean[ed] [her] into not enforcing Respondents' promise." The ALJ determined that through this conduct, all three failed to act in the client's best interest; engaged in dishonest, unethical, or unprofessional conduct; and engaged in conduct of a character likely to deceive, defraud or harm the public. 68 Ill. Admin. Code § 1450.900(a); 225 ILCS 454/20-20(a)(40) (West 2012)). The ALJ determined, however, that the evidence did not establish that SREG had failed to provide Esono-Sanchez a refund.

¶ 40   The ALJ also found that the evidence proved that Jack told Burton during her investigation that he was the managing broker in charge of SREG when Anne was not available, and that he represented himself to be the manager of the brokerage in a televised news documentary. He determined that this conduct was a misrepresentation to Burton and an obstruction of the investigation, constituting dishonorable conduct. 68 Ill. Admin. Code § 1450.900 (West 2012).

13

Sher also falsely held himself out as the managing broker when Anne was not available, which likewise violated the Act.

¶ 41    Finally, the ALJ determined that Shaw respondents had failed to produce several documents and exhibits requested by the Department, including escrow records, documents regarding the Perrys, and videotapes of interactions with clients.

¶ 42    The ALJ found the Department's witnesses to be credible. He found Wasiak's testimony to be open and direct, as well as internally consistent and consistent with the documentary evidence. He noted that Wasiak, in a few instances, inadvertently substituted Sher's name for Shaw, but that he readily corrected himself. The ALJ also found the testimony of Burton, Esono-Sanchez, and Benjamin to be open and direct, and consistent with the documentary evidence.

¶ 43    The ALJ determined that these findings proved, by clear and convincing evidence, several of the counts alleged in the administrative complaint against Shaw respondents, including, specifically, charges that they had failed to properly furnish required information to rental finding service clients including Esono-Sanchez, the Perrys, Bael, Fausto, Jackson, and Benjamin; and that they had improperly denied refunds to the Perrys, Bael, Fausto, Jackson, and Benjamin. The ALJ also determined that the Department had proved that Shaw respondents employed an unlicensed assistant who showed a property to Esono-Sanchez, that that they were responsible for Sher's disparaging remarks to Esono-Sanchez, and that that they did not find appropriate properties for the Perrys as promised. The ALJ also concluded that certain other counts were not proven by clear and convincing evidence, including that Esono-Sanchez had been improperly denied a refund.

¶ 44    In determining discipline, the ALJ weighed factors in aggravation and factors in mitigation, citing 20 ILCS 2105/2105-130(b)(1) (West 2018). In aggravation, the ALJ noted the presence of

multiple offenses against seven different clients over a period of three years; the impact of the offenses on the injured parties in terms of lost time and money; the vulnerability of the injured parties, noting Esono-Sanchez and her minor children were homeless and that Benjamin's former apartment was hazardous to her child's health; Shaw respondents' lack of contrition for the offenses; Shaw respondents' financial gain from committing the offenses; the lack of cooperation with the Department; and Shaw respondents' failure to appear at the hearing. 20 ILCS 2105/2105-130(b)(2), (5), (7), (8), (9) (West 2018). In mitigation, the ALJ found that restitution in the form of a refund had been made to one client, but that no other factor in mitigation applied.

¶ 45    The ALJ noted that the violations at issue were not isolated incidents, and the conduct of Shaw respondents and Sher exhibited significant indifference to the best interests of the clients. The ALJ determined that significant discipline was appropriate for protection of the public. When considering the appropriate discipline for Shaw respondents in comparison to Sher, the ALJ determined that Shaw respondents should be disciplined more because they benefited financially from the violations in a way that Sher did not, and thus, they had greater incentive to continue violating the Act. The ALJ also noted that Shaw respondents' lack of participation in the formal hearing indicated "disrespect for the disciplinary process and some lack of concern for their professional fate."

¶ 46    The ALJ recommended that Jack's real estate broker license and SREG's real estate broker corporation license be indefinitely suspended for a minimum of three years, and that each be fined $18,000. For Sher, the ALJ recommended an indefinite suspension of his real estate leasing agent license for at least 18 months and a $5000 fine. Finally, the ALJ concluded that Jack's application for a managing broker license and Sher's application for a real estate broker license should be denied.

15

¶ 47　Following the issuance of the ALJ's report and recommendation, the Real Estate Administration and Disciplinary Board ("Board") issued its recommended decision, adopting the ALJ's findings of fact, conclusions of law, and recommended discipline.

¶ 48　In September 2016, Shaw respondents obtained new counsel, the Franklin Law Group, and moved for rehearing. They argued that the ALJ should not have proceeded forward with the hearing in the absence of their counsel, that the Department had not proven any violations of the Act by clear and convincing evidence, and that the recommended discipline was arbitrary and unreasonable.

¶ 49　On October 28, 2016, the Director adopted the Board's disciplinary recommendations and denied Shaw respondents' motion for rehearing, concluding that Shaw respondents and their attorneys were responsible for their own failures to appear. The Director noted that Shaw Legal Services had been counsel for Shaw respondents throughout the proceedings. The Director also noted that the ALJ's March 22, 2016, order emphasized that Shaw Legal Services remained counsel in this matter, that the formal hearing remained scheduled for March 30, 2016, and that respondents must appear. The Director stated that "[i]t was neither unreasonable or unfair, after two and a half years of continuances, motion practice and delay in the production of discovery by Respondents, during all of which time they were represented by Shaw Legal Services Ltd., for the ALJ to proceed with the Formal Hearing."

¶ 50　The Director also declined to reverse the ALJ's factual findings, and concluded that the ALJ had given thoughtful and thorough consideration to various factors in aggravation and had appropriately determined discipline. He noted that the purpose of the Act is to protect the public, and that Shaw respondents' conduct was "alarming," demonstrating "flagrant" and "repeated" disregard for the Act and for the protection of the public, including some of its most vulnerable

16

members." Accordingly, the Director declined to "undermine the Board's expertise and experience in determining what sanction is appropriate to protect the public interest."

¶ 51    Following the Director's decision, Shaw respondents filed a complaint for administrative review in the circuit court. Shaw respondents filed briefs arguing that the ALJ should not have conducted the hearing without them or their counsel present; that the evidence before the ALJ was largely hearsay and unauthenticated documents; and that the recommended discipline was overly harsh, arbitrary, and unreasonable. The Department argued in its brief that it afforded Shaw respondents due process, its decision was not against the manifest weight of the evidence, and the discipline imposed was not an abuse of discretion.

¶ 52    The circuit court heard oral argument on October 17, 2017. In response to the court's questioning about whether Shaw Legal Services was the "counsel of record throughout the three-and-a-half year proceeding," Shaw respondents' counsel replied "Absolutely. And we do not dispute that at all." The court stated:

> COURT: the notices of this hearing require Respondents' appearance at that hearing. Mr. Sher was there and Mr. Shaw was not. The notices require the appearance of Respondents. We know this, right? In fact, there's evidentiary rules that indicate if you're not there you're deemed to have waived any objections –
>
> COUNSEL: Understood.
>
> COURT: – in an administrative proceeding.

¶ 53    Counsel, argued, however, that Shaw respondents and Shaw Legal Services "had no reason to expect they needed to be there" because they believed Orman would represent them.

¶ 54    Regarding discipline, respondents' counsel argued that Jack, as owner of the business, was subject to a "double penalty," because he was subject to two $18,000 fines, personally and for the business.

¶ 55    Following argument, the court concluded that the ALJ's 39-page report and recommendation was "thorough and supported by the testimony and the record." The court also noted that, to the extent certain evidence constituted hearsay, "hearsay statements may be admitted into evidence in administrative hearings if the statement has circumstantial guarantees of trustworthiness, and if its probative value outweighs any prejudice resulting from the inability to cross examine the declarant." Under the "facts and circumstances," and given the lack of objection to the admission of such evidence, the court concluded that a reversal of the findings of fact and conclusions of law was not warranted.

¶ 56    Regarding the discipline imposed, however, the court stated that it "[wa]s persuaded *** that the record may reveal an overly harsh double counting of penalties between [SREG] and Mr. Shaw." The court stated that it was affirming "the administrative findings of fact and conclusions of law," but remanding "solely for the limited purpose of consideration of the penalty." The court asked the Department's counsel how long she thought "it w[ould] take for a remand on this limited issue." Counsel stated that she was not sure, but that it "may be something where the [D]irector can just consider on [his] own without the Board's recommendation." Shaw respondents' counsel stated that he "concur[red] with counsel," and "d[id]n't know if this is a matter that goes back before the [Board], or if this is something the [D]irector and general counsel can address independent[ly]." The court then continued the matter for status.

¶ 57    In January 2018, on remand from the circuit court, the Director issued a new order. The Director noted that each of Shaw respondents had violated the Act 57 times, and that the Act

authorized a fine of up to $25,000 for each violation. He determined that the fines imposed were modest in light of the potential amount authorized by the Act, and served the Act's purpose to protect the public, because "appropriately substantial discipline" for "egregious and repeated violations of the Act" deters other licensees from committing similar violations. The Director determined that the fines, roughly three times the amount of Shaw respondents' monetary gain, were not overly harsh or unreasonable and were related to the Act's purpose.

¶ 58    The Director also explicitly noted that the fines did not double-count penalties against Shaw respondents, because the Act specifies license requirements for corporations and treats corporations as persons for regulatory and discipline purposes. The Director concluded that the Act "compel[led] the Department to discipline both the corporate and individual Respondent. *** The issue of who may or may not own all or a part of the corporate Respondent should not defeat the plain intent of the Act: to punish any and all licensees who have violated the Act."

¶ 59    The Director also found that the discipline was reasonable in comparison among Shaw respondents and Sher, because Shaw respondents did not respect the Department's procedure or participate in the disciplinary proceedings, whereas Sher did. Moreover, Shaw respondents "benefitted from their violations of the Act by direct client payments in a way [Sher] did not." The Director concluded that the discipline imposed was fair, not overly harsh or arbitrary, within the bounds of the Act, and related to the Act's purpose.

¶ 60    In February 2018, Shaw respondents' new counsel requested leave to withdraw, which the circuit court granted. In March 2018, Shaw respondents, through Shaw Legal Services, filed in the circuit court a motion to vacate the Director's January 2018 order and for other relief.

¶ 61    After argument at the on July 23, 2018, hearing on Shaw respondents' motion to vacate, the circuit court granted in part and denied in part Shaw respondents' motion. The court stated that

it did "not believe that we are comparing apples to apples" when comparing Shaw respondents to Anne, "who was cooperative, who did take responsibility for her role, and who was dissimilarly situated than Mr. Sher, Mr. Shaw and the entity itself," and accordingly, a sanction similar to hers was inappropriate.

¶ 62    The court, however, found a "stark difference" in the fines imposed against Shaw respondents and Sher. The court noted that Sher appeared at the hearing, but found that he provided, "quite frankly, very little mitigation," and "primarily what he did was show up." The court also found "no indication that [Shaw] walked away and pocketed" the $8,020 in profits from clients, and accordingly, the court found it an "an unfair characterization to say that Mr. Shaw himself profited" by that amount.

¶ 63    The circuit court then found that the $18,000 penalty to both Jack and SREG was "overly harsh, arbitrary, not proportionate to the other fines imposed." It concluded that the "appropriate amount of penalty against Mr. Jack Shaw should be in the same amount as that charged against Mr. Sher"—$5,000. As to SREG, the court also found "$5,000 [to be] an appropriate penalty, in addition to the $8,020 that was deemed to be taken from clients," for a total fine of $13,020. The circuit court further ordered that their suspensions would stand.

¶ 64    The Department moved for partial reconsideration based on the court's decision to reduce the fines, and Shaw respondents appealed. After the circuit court denied reconsideration, the Department cross-appealed.

¶ 65    In this court, Shaw respondents raise several challenges to the procedure utilized by the Department, the factual findings and conclusions made by the Department, and the discipline imposed. The Illinois Administrative Code (Code) provides that all final administrative decisions of the Department are subject to review under the Administrative Review Law (see 735 ILCS 5/3–

101 *et seq.* (West 2016)); 215 ILCS 5/407 (West 2016)). In reviewing a final administrative decision, we review the Director's decision and not the ALJ's or the circuit court's determination. *Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2014 IL App (1st) 123319, ¶ 19. The standard of review depends on the question presented—this court reviews factual questions under the manifest weight of the evidence standard, questions of law *de novo*, and mixed questions of law and fact under the clearly erroneous standard. *Heabler v. Illinois Department of Financial & Professional Regulation*, 2013 IL App (1st) 111968, ¶ 17; *Kafin v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2012 IL App (1st) 111875, ¶ 31.

¶ 66    "It is for the Director, as the trier of fact, to evaluate all evidence, judge the credibility of witnesses, resolve any conflicts in the evidence, and draw reasonable inferences and conclusions from the facts." *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 561 (2004). "The Director may accept or reject as much or as little of a witness's testimony as he pleases." *Morgan v. Department of Financial & Professional Regulation*, 388 Ill. App. 3d 633, 658 (2009). It is not the function of this court to " 'reevaluate witness credibility or resolve conflicting evidence,' but rather to determine only 'whether the findings of fact are supported by the manifest weight of the evidence.' " *Id.* (quoting *Ulysse v. Lumpkin*, 335 Ill. App. 3d 886, 893 (2002)).

¶ 67    Before addressing Shaw respondents' arguments on appeal, however, this court notes various violations by Shaw respondents of the rules regarding appellate briefs in this appeal. In Shaw respondents' fact section, they cite to and describe more than 100 pages of documents that were not included in the record on appeal, but that they claim are "available upon request" should this court "wish[] to review them." Large portions of the argument section are unsupported by

citation to authority or the record on appeal (see Ill. Sup. Ct. R. 341(h)(7) (West 2016) (argument section shall contain "citation of the authorities and the pages of the record relied on"), and when Shaw respondents do cite authority, they often use lengthy block quotes, or quote several different authorities in a row, with little to no discussion or analysis of those authorities (see Ill. Sup. Ct. R. 341(a) (West 2016) ("lengthy quotations are not favored and should be included only where they will aid the court's comprehension of the argument.")). Shaw respondents' fact section also contains various remarks violating their obligation to set forth the facts "accurately and fairly without argument or comment." Ill. S. Ct. R. 341(h)(6) (West 2016). Moreover, Shaw respondents make numerous improper arguments based on facts outside the record, specifically regarding claims about their former clients and the services they provided to them, their communications with the Department, alleged advice given to them by counsel, Jack's limited involvement in the scheme, and the financial impact that the discipline has had on Jack. This court will not consider matters outside the record on appeal. *Kildeer-Countryside School District No. 96 v. Board of Trustees of Teachers' Retirement System of State*, 2012 IL App (4th) 110843, ¶ 21 ("generally, a party may not rely on matters outside the appellate record to support his or her position on appeal.").

¶ 68    Turning to the merits of Shaw respondents' appeal, they first argue that the Department violated their due process rights by conducting the administrative hearing without them or their counsel present, and by failing to conduct a new hearing on remand to reconsider the discipline imposed against them. Where, as here, the issue involves a due process challenge—a question of law—we apply a *de novo* standard of review. *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 824 (2009).

¶ 69     An administrative proceeding is governed by the fundamental principles and requirements of due process of law. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92 (1992). However, due process is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 201 (2009); *Abrahamson*, 153 Ill. 2d at 92, citing *Scott v. Department of Commerce & Community Affairs*, 84 Ill. 2d 42, 51 (1981), and *Telcser v. Holzman*, 31 Ill. 2d 332, 339 (1964).

¶ 70     "[A]n administrative hearing is not a partisan hearing with the agency on one side arrayed against the individual on the other. Rather, it is an administrative investigation instituted for the purpose of ascertaining and making findings of fact." *Abrahamson*, 153 Ill. 2d at 94. Accordingly, our supreme court has held that procedural due process in an administrative proceeding does not require a proceeding in the nature of a judicial proceeding. *Id.*, at 92. Rather, "a fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence." *Id.*, at 94; see also *Chamberlain v. Civil Service Commission of Village of Gurnee*, 2014 IL App (2d) 121251, ¶ 46 ("Although due process envisions an orderly proceeding wherein notice and an opportunity to be heard are afforded, procedural due process in an administrative setting does not always require application of the judicial model." (internal quotation marks and citation omitted)).

¶ 71     We find no deprivation of due process by the Department proceeding with the hearing against Shaw respondents, after they were ordered to appear but failed to do so. The Code contemplates the possibility that a party may fail to appear for the hearing, and that the hearing will be conducted in his or her absence, stating that the "[f]ailure to appear at the time and place set for formal hearing shall be deemed a waiver of the right to present evidence ***." 68 Ill. Admin.

Code § 1110.100 (West 2016). This court has found no authority, and Shaw respondents point to no authority, indicating that this regulation is unconstitutional.

¶ 72    The record here shows that the hearing date was set three months in advance, with notice to Shaw respondents' counsel, Mackoff. A week prior to hearing date, Mackoff withdrew at the respondents' request. The ALJ allowed Mackoff to withdraw, but reiterated that the hearing remained scheduled for March 30 and 31, 2016, and that respondents were required to appear at the hearing in person. The order was served directly on Shaw respondents, as well as on their remaining counsel, Shaw Legal Services.

¶ 73    Neither Shaw respondents nor their counsel, Shaw Legal Services, appeared on either hearing date, and they did not ask for a continuance or otherwise object to the hearing at that time. After Shaw respondents and their counsel failed to appear, the ALJ heard argument and testimony from four witnesses, received documents into evidence, and prepared a 45-page report based on the two-day hearing.

¶ 74    Although Shaw respondents contend that they were "unequivocally entitled" to "be present" at the hearing, they are the ones who were responsible for their own absence. The Department notified respondents personally, and through counsel, of the hearing and their obligation to attend, and Shaw respondents do not claim to have not received that notice. At the hearing, the ALJ provided Shaw respondents with an impartial fact finder, as well as the opportunity to be heard and to cross-examine witnesses. See *Abrahamson*, 153 Ill. 2d at 95. Shaw respondents were, indeed, entitled to be present at the hearing, but they failed to avail themselves of the process afforded to them. See 68 Ill. Admin. Code § 1110.100 (West 2016).

¶ 75    Shaw respondents also contend that the ALJ was "constitutionally bound to ensure [Shaw respondents] were represented" at the hearing. However, there is no requirement that Shaw

respondents be represented by counsel during an administrative disciplinary hearing. The regulations provide only that the parties may be represented by counsel—not that they must be. 68 Ill. Admin. Code § 1110.90(a) (West 2016) (a party "may be represented by an attorney"); 68 Ill. Admin. Code § 1110.90(c) (West 2016) (a party "may appear on his own behalf"); see also *Wolfe v. Board of Education of City of Chicago*, 171 Ill. App. 3d 208, 210-211 (1988) (finding no authority to support claim that there is a "constitutional right to be adequately represented by counsel in a civil matter or an administrative hearing," or that the "inadequacy of counsel constitutes grounds for a new trial or new hearing in a civil proceeding.").

¶ 76 Shaw respondents specifically complain, without any citation to the record, that counsel Orman "misle[]d" them into believing that they "should do nothing but wait for [the Department's] order." This court finds no support for Shaw respondents' allegations. To the contrary, we note that the record shows that, at the time of the hearing, Orman had withdrawn from the case at the respondents' request, and he was no longer representing them.

¶ 77 Nonetheless, there is no constitutional right to be adequately represented by counsel in a civil matter or an administrative hearing, and complaints about the adequacy of counsel are not grounds for a reversal or a new hearing. *Wolfe*, 171 Ill. App. 3d at 210-12 (finding that the circuit court erred when it remanded the cause for a new hearing based on the alleged inadequacy of counsel—under Administrative Review Law, the circuit court has no authority to order a new hearing "due to the inadequate legal representation of the losing party.").

¶ 78 If Shaw respondents were unsatisfied with their counsels' representation, either based on counsel Orman's allegedly misguided instructions, or based on the failure of Shaw Legal Services to appear at the hearing, other avenues of recourse were available to address their grievances. See *id.*, at 212 ("It would be unfair to put the prevailing party in a civil case to the inconvenience and

expense of a new trial because the losing party has problems with its attorney. The ends of justice would not be served by prolonging controversies for that reason. The losing party has other remedies available to correct any alleged wrongdoing on the part of the law firm or attorneys who undertook to represent him.")

¶ 79    We also reject Shaw respondents' claim that the failure to hold a new hearing on remand violated their due process rights. In support of their claim, Shaw respondents rely on *Lamm v. McRaith*, 2012 IL App (1st) 112123, which found a due process violation based on the failure to hold a hearing on remand based on the facts of that case. We find *Lamm* distinguishable from the instant case.

¶ 80    In *Lamm*, an insurance producer plaintiff sought administrative review of the revocation of his state insurance producer's license. *Id.*, ¶ 1. The circuit court found that the Department had made various errors of law in its interpretation of the Illinois Insurance Code, and that the record did not clearly establish that plaintiff violated the Illinois Insurance Code. The circuit court remanded the cause "for re-examination and re-evaluation," noting the "cloudy" nature of the evidence in the record. *Id.*, ¶¶ 15-16. On remand, and without an administrative hearing, the ALJ made new findings of fact and conclusions of law which the Director adopted, finding a violation and entering the same discipline against the plaintiff.

¶ 81    On appeal, this court noted that "administrative agencies are not required to conduct an additional hearing each time they revisit a decision on remand." *Id.*, ¶ 28. However, under the particular circumstances of the case, this court concluded that the failure to hold a new hearing on remand violated the plaintiff's due process rights. "After carefully reviewing th[e] order" remanding the matter, this court "d[id] not see how" the circuit court's order could be followed without a new hearing on remand. *Id.*, ¶ 24. Because the plaintiff's violation was "unsettled by the

record," a new hearing was necessary to clarify the evidence "or to reevaluate the penalty imposed without first clearing up the cloudy impression." *Id.*

¶ 82    Unlike in *Lamm*, where a new hearing was warranted because the evidence in the record did not clearly establish any violation, this court does not have the same "cloudy impression" of the evidence in this case. Instead, there was extensive evidence presented at the two-day hearing, which established the respondents' participation in a scheme that violated many provisions of the Act.

¶ 83    Moreover, and also unlike *Lamm*, we do not read the circuit court's order to require such a hearing here. Instead, in remanding the matter, the circuit court expressed concern with whether the Department was inadvertently "double-counting" the penalties against Jack, because he was disciplined both personally and through his ownership of SREG. This was a question for which a new evidentiary hearing on remand was unnecessary. On remand, the Department considered the question posed by the circuit court and entered a new order responding to the court's concerns. The Director explicitly noted that the fines did not double-count penalties against Shaw respondents, concluding the Act's purpose required separate penalties.

¶ 84    Additionally, even if we were to find that the failure to hold a hearing on remand was erroneous, Shaw respondents invited that procedure when, at the hearing after a remand was ordered, counsel for Shaw respondents concurred with the Department's suggestion that the Director may have been able to address the remand independently. See *Gaffney v. Board of Trustees of Orland Fire Protection District*, 2012 IL 110012, ¶ 33 ("The rule of invited error or acquiescence *** prohibits a party from requesting to proceed in one manner and then contending on appeal that the requested action was error."). Accordingly, we find no due process violation from the Department's failure to hold a new evidentiary hearing on remand.

¶ 85    Shaw respondents next contend that there was not clear and convincing evidence that they violated the Act because the evidence presented at the 2016 hearing was "vague, inadmissible, and not competent." Shaw respondents particularly challenge the Department's consideration of "hearsay" evidence based on the testimonies of Wasiak and Burton, and further contend that those witnesses did not provide an adequate foundation for entry of the contract documents as exhibits. We review an administrative agency's decision regarding the admission of evidence for an abuse of discretion (*Matos v. Cook County Sheriff's Merit Board,* 401 Ill. App. 3d 536, 541 (2010)), and this court may affirm an order admitting or excluding evidence on any ground that appears in the record (*Carroll v. Preston Trucking Co.*, 349 Ill. App. 3d 562, 566 (2004) (citing *Hawkes v. Casino Queen, Inc.*, 336 Ill. App. 3d 994, 1005 (2003))).

¶ 86    We note, initially, that Shaw respondents waived any objection to the admission of such evidence by failing to raise their objections at the hearing. See *Jackson v. Board of Review of the Department of Labor,* 105 Ill. 2d 501, 508 (1985) ("It is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect.").

¶ 87    Waiver aside, we do not find the admission of the contracts, or the testimony from Wasiak or Burton, to be an abuse of discretion. Department regulations allow hearsay to "be admitted if it has circumstantial guarantees of trustworthiness, and if the probative value of the statement outweighs any prejudice resulting from an inability to cross-examine the declarant." 68 Ill. Admin. Code § 1110.220(b) (West 2016). Here, the Department could have reasonably concluded that the clients' discussions with investigators had circumstantial guarantees of trustworthiness where they consistently described their experiences in discussions with two separate investigators. Moreover, the clients' statements were corroborated by each other, as well as by the clients who did testify

and were available for cross-examination, in describing a consistent pattern of violations by the respondents. The only prejudice Shaw respondents point to from the inability to cross examine the declarants is that the hearsay testimony led to "improper inference[s], which caused [them] to lose their license[s] and livelihood." However, in contending that the inferences from the evidence was improper, Shaw respondents rely on evidence outside the record, which this court will not consider. *Kildeer-Countryside School District No. 96*, 2012 IL App (4th) 110843, ¶ 21.

¶ 88 Nonetheless, this court fails to see how any prejudice could be established from Shaw respondents' inability to cross-examine the declarants, particularly where they failed to appear, forfeiting their ability to cross-examine any witnesses in any event. In these circumstances, the ALJ's decision to admit this evidence was well within his discretion. See *Dookeran v. County of Cook*, 396 Ill. App. 3d 800, 814 (2009).

¶ 89 Moreover, even if we were to conclude that the ALJ improperly considered hearsay evidence, an administrative decision will not be overturned because the administrative judge failed to observe the rules of evidence unless the error "materially affected the rights of any party and resulted in substantial injustice to [the party]." 735 ILCS 5/3–111(b) (West 2016); see *Kafin,* 2012 IL App (1st) 111875, ¶ 38; *Matos,* 401 Ill. App. 3d at 541 (an evidentiary ruling, even if incorrect, will not be reversed unless there is "demonstrable prejudice to the complaining party."). As explained above, we find no substantial injustice or demonstrable prejudice from the ALJ's admission of the relevant evidence here.

¶ 90 Finally, Shaw respondents assert that the discipline imposed against them by the Department was improper. They do not appear, however, to challenge the circuit court's order on this point, instead contending that the trial court's reasoning for reducing their fines was "true." On cross appeal, the Department contends that the Department's choice of sanction was not an

abuse of discretion, and that the circuit court improperly reduced the fines assessed. Because these issues both concern the propriety of the sanctions imposed by the Department, we will consider them simultaneously.

¶ 91    When reviewing the propriety of a particular sanction imposed by the Director, the standard of review is whether the Director abused his discretion in the imposition of the sanction. *Kafin*, 2012 IL App (1st) 111875, ¶ 42; *Reddy v. Department of Professional Regulations*, 336 Ill. App. 3d 350, 354, (2002). The Director abuses his discretion when a sanction is imposed that is overly harsh, arbitrary or unreasonable in view of the mitigating circumstances; or unrelated to the purpose of the statute. *Siddiqui v. Department of Professional Regulation*, 307 Ill. App. 3d 753, 763 (1999); *Kafin*, 2012 IL App (1st) 111875, ¶¶ 42–43.

¶ 92    A reviewing court does not make its own assessment of what discipline is appropriate, and whether a sanction is "overly harsh in view of the mitigating circumstances *** must be viewed in light of the abuse-of-discretion standard of review." *Sonntag v. Stewart*, 2015 IL App (2d) 140445, ¶ 22. "Under that standard, an agency's decision will not be disturbed unless it is arbitrary or capricious, or unless no reasonable person would agree with the [agency's] position." (Internal quotation marks and citation omitted.) *Id*. This standard is "one of rationality, and the reviewing court will not substitute its own reasoning in the absence of a clear error of judgment on the part of the agency." *1212 Restaurant Group, LLC v. Alexander*, 2011 IL App (1st) 100797, ¶ 59. "Agency action is arbitrary and capricious when the agency contravenes the legislature's intent, fails to consider a crucial aspect of the problem, or offers an implausible explanation contrary to agency expertise." *Wade v. Illinois Commerce Comm'n*, 2017 IL App (1st) 171230, ¶ 26.

¶ 93    Shaw respondents initially contend that the sanctions imposed against them were overly harsh when compared to the other respondents, Sher and Anne. They argue that the Department

"provided no justification in logic to impose a fine 360% greater against [the Shaw respondents] than Respondent Sher and 36,000% greater against [the Shaw respondents] than Respondent Anne." This contention, however, is factually inaccurate.

¶ 94    The Department noted that the discipline received by Anne did not provide a relevant comparison because she cooperated with the investigation, acknowledged her wrongdoing, and entered a consent order. See *Nwaokocha v. Illinois Department of Financial and Professional Regulation*, 2018 IL App (1st) 162614 (the fact that other parties with whom the plaintiff compared his discipline entered into consent orders was a proper "point of distinction" justifying the plaintiff's more severe sanction); see also *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 58 (noting that in the criminal context, a "sentence imposed on a codefendant who pleaded guilty as part of a plea agreement does not provide a valid basis of comparison to a sentence entered after a trial.").

¶ 95    In comparison to Sher, the Department noted that Sher participated in the administrative hearing, while Shaw respondents did not, illustrating their "disrespect for the disciplinary process and some lack of concern for their professional fate." Also unlike Sher, Shaw respondents benefited financially from violating the Act by direct client payments, and thus had a "greater incentive to continue their violations of the Act." Accordingly, the Department concluded that Shaw respondents warranted more significant discipline.

¶ 96    On the facts of this case, we do not find the sanctions imposed to be arbitrary or capricious, or that no reasonable person would agree with the Department's position that such a difference in sanctions was warranted. The purpose of the Act is "to evaluate the competency of persons engaged in the real estate profession and to regulate their activities for the protection of the public." 225 ILCS 454/1–5 (West 2016). On review, "[w]e must defer to the administrative agency's

expertise and experience in determining what sanction is appropriate to protect the public interest." *Reddy*, 336 Ill. App. 3d at 354.

¶ 97    In this case, the Director found that sanctions suspending and denying Shaw respondents' licenses and imposing separate $18,000 fines were appropriate based on a variety of factors, including the large number and seriousness of the offenses; the vulnerability of, and harm to, the injured parties; and Shaw respondents' financial gain, failure to appear, lack of cooperation, and lack of contrition. It also found that the respondents' conduct "denote[d] a significant indifference to the best interests of the clients. Respondents' conduct was not an isolated occurrence, but a prolonged series of discrete offenses over the course of several years. Significant discipline is appropriate for the protection of the public." Deferring to the Director's expertise and experience, as we must, our review of the record reveals that the sanction imposed was neither unreasonable nor arbitrary or capricious, nor was it unrelated to the purpose of the statute. *Siddiqui*, 307 Ill. App. 3d at 763; *Kafin*, 2012 IL App (1st) 111875, ¶¶ 42–43.

¶ 98    Shaw respondents, however, specifically contend that the Act is remedial and not penal in nature, and accordingly, they argue that the "Act does not authorize fines beyond what is necessary to remediate the situation. As such any fine sought beyond what is required to refund each claimant is error and an abuse of discretion." Accordingly, they maintain that any sanction must be limited to the amount the Department found that they failed to provide as refunds. In support of their contention that the Act is remedial and not penal, they cite *Gruwell v. Illinois Dept. of Financial and Professional Regulation*, 406 Ill. App. 3d 283, 290-96 (2010), which states that the "Act is not a penal measure, to be strictly construed against the State, but a broad statutory system which is remedial and therefore should be liberally construed. *** The intent of the General Assembly in

32

enacting this statute is to evaluate the competency of persons engaged in the real estate business and to regulate this business for the protection of the public."

¶ 99    Our supreme court considered and rejected a similar challenge in *Scott v. Association for Childbirth at Home, International*, 88 Ill. 2d 279, 288 (1981). In that case, the Attorney General brought an action against an association for home childbirth under the Consumer Fraud and Deceptive Practices Act (CFDPA). The association challenged the constitutionality of the CFDPA, claiming that the Act was penal in nature based on the "fact that a civil penalty of up to $50,000 c[ould] be imposed" under the CFDPA. The supreme court found the argument

> "entirely without merit. The Act is a regulatory and remedial enactment intended to curb a variety of fraudulent abuses and to provide a remedy to individuals injured by them. Its stated purpose, set forth in its preamble, is to protect Illinois consumers, borrowers, and businessmen against fraud, unfair methods of competition, and other unfair and deceptive business practices. The Act is clearly within the class of remedial statutes which are designed to grant remedies for the protection of rights, introduce regulation conducive to the public good, or cure public evils. *** [A]s in the case of the Environmental Protection Act, the penalty is but one part of the regulatory scheme, intended as a supplemental aid to enforcement rather than as a punitive measure." *Id.*

¶ 100   Similarly here, one of the stated purposes of the Act is to regulate the activities of "persons engaged in the real estate business" for "protection of the public." Shaw respondents' proposed approach, limiting any fine to the amount they wrongly refused to refund, would undermine the purpose of the Act, and it cannot be reconciled with the plain language of the Act, which authorizes

fines of up to $25,000 for each of 46 enumerated types of violations—many of which do not involve any direct financial gain. See 225 ILCS 454/20-20(a)(1)-(46) (West 2016).

¶ 101   In their reply, Shaw respondents contend that the supreme court's decision in *Scott*, 88 Ill. 2d 279, does not apply, arguing for the first time that their licenses, as a property right, are a "fundamental right" and that the Act is subject to "strict scrutiny," and must be "narrowly tailored" and "construed strictly against the [S]tate." We find that Shaw respondents forfeited this argument by raising it for the first time in their reply brief. Ill. Sup. Ct. R. 341(h)(7) ("Points not argued are forfeited and shall not be raised in the reply brief.").

¶ 102   Nonetheless, our supreme court previously rejected this argument in *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 29. It stated:

> "While this court has held that a license to practice medicine is a property right, within the meaning of the constitutional guarantees of due process of law, this simply means that proceedings to revoke medical licenses must comply with procedural due process guarantees. The right to pursue a profession is not a fundamental right for substantive due process purposes, however, and legislation infringing upon that right need only be examined using the rational basis test." (internal quotation marks and citations omitted).

¶ 103   Although *Hayashi* dealt with the Medical Practice Act, rather than the Real Estate License Act at issue here, its conclusion applies equally here.

¶ 104   Since we have found no abuse of discretion by the Director in its choice of discipline, we necessarily agree with the Department's argument in its cross-appeal that the circuit court improperly reduced the fines assessed.

¶ 105   For the forgoing reasons, we conclude that it was not unreasonable for the Director to suspend the licenses of Shaw respondents, and impose separate $18,000 fines for their respective violations of the Act. We therefore defer to the experience and expertise of the Department in fashioning the appropriate sanctions. We vacate the order of the circuit court of Cook County which reduced the fines against Shaw respondents, remand this matter for the imposition of the discipline ordered by the Director, and affirm the circuit court's judgment in all other respects.

¶ 106   Affirmed in part, vacated in part, and remanded with directions.